IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**GRACE GARCIA,**

    **Plaintiff,**

vs.                                                                                                  Civil No. 05-417 RLP

**JO ANNE B. BARNHART,**
**Commissioner,**
**Social Security Administration,**

    **Defendant.**

**<u>MEMORANDUM OPINION AND ORDER</u>**
**<u>GRANTING PLAINTIFF'S MOTION TO REVERSE OR REMAND</u>**
**<u>ADMINISTRATIVE AGENCY DECISION</u>**

      Plaintiff, Grace Garcia, brings this action pursuant to 42 U.S.C. §405(g) seeking judicial review of Defendant Commissioner of Social Security's denial of her application for supplemental security benefits under Title XVI of the Social Security Act. Plaintiff contends that the Commissioner erred by: Failing to reconstruct the record as dictated by the Appeals Council's Remand Order of March 13, 2003; failing to base his findings regarding Plaintiff's mental impairment on substantial evidence and correct legal principles; posing a legally inadequate hypothetical question to the vocational expert: and relying on vocational testimony that is in conflict with plaintiff's assessed SVP.

*Factual Background.*

      Plaintiff was born on May 4, 1953. [Tr. 64]. She attended school to the 11th grade and obtained a GED. [Tr. 169, 150]. She required no special assistance in school. [Tr. 150]. Plaintiff sustained a back injury while working as a motel maid in 1988. [Tr. 105]. In February 1989 her treating physician diagnosed a sacroiliac problem with reflex muscle spasm. He felt that with conditioning and a work hardening program, she could return to work in 6-12 weeks. (Tr. 109). In

January 30, 1990, a different physician reporting to her workers' compensation carrier diagnosed partially resolved lumbar disc injury or chronic facet syndrome. This diagnosis was based on EMG findings compatible with L5/S1 radiculopathy. (Tr. 112).

The medical record is silent until September 29, 1995, when plaintiff was evaluated by John Foster, M.D., an orthopedic surgeon who evaluated her at the request of the Disability Determination Unit. (Tr. 113-117). Dr. Foster had difficulty examining plaintiff due to her extreme reaction to touch.[1] He indicated that her radiculopathy should resolve because she had no evidence of herniated disc or significant facet arthropathy. Dr. Foster felt that plaintiff's most significant problem was depression, stating "I cannot conceive of getting her to go back to work without considerable psychiatric treatment." (Tr. 114).

Plaintiff was seen at the Border Area Mental Health Services ("BAMHS" herein) from November 1996 to January 1997 . (Tr. 167). Her work up included the Beck Depression Inventory, a psychosocial history, clinical interview, medication review and psychiatric evaluation[2]. (Tr. 201). She was diagnosed as suffering from Dysthymic Disorder and Major Depressive Disorder, Recurrent (Axis I); Personality Disorder NOS (Self Defeating) (Axis II), with GAF ratings of 51-60 currently and 61-70 during the prior year.[3] (Tr. 201, 199). A counseling program was initiated and she was

---

[1]Plaintiff complained of pain from the base of her neck to her tail bone, pain down her right arm, numbness of the fingers of the right hand, tingling of the toes of the right foot, and extremely limited ability to sit, stand or walk, difficulty sleeping and depression. Dr. Foster documented pain and reduced range of motion of both knees, a positive Tinel's sign in the right wrist, no muscle spasm, negative straight leg raising test. He was unable to assess range of motion of her lumbar spine.

[2]Mental status examination described her affect as blunted and flattened, her speech as less than adequate, no evidence of a thought disorder, low to low-average intelligence, appropriate dress, intact long and short term memory, with evidence of delusions or hallucinations (hearing voices) .

[3]The GAF scale (Global Assessment of Functioning) ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."

placed on medication for depression and auditory hallucinations. (Id.). Plaintiff attended two counseling sessions, and seemed to be responding to therapy before she stopped coming to counseling sessions and stopped taking her medications. (Tr. 167, 194). Her file was closed on March 4, 1997. (Tr. 195).

The medical record is again silent until March 23, 1999, when Plaintiff returned to BAMHS, complaining of depression, which was "getting much worse" and unbearable anxiety. (Tr. 172, 158, 194). Plaintiff stated that she suffered significant problems with anxiety, depression, mood swings, stress, vision changes, headaches, dizziness and back pain. (Tr. 161-162). She complained of a multitude of physical and emotional problems.[4] The Beck Depression Inventory was administered, and indicated severe depression. (Tr. 175). She was diagnosed as suffering from Major Depressive Disorder, Recurrent, Severe with Psychotic Features, and Panic Disorder with Agoraphobia (Axis I) with a present GAF of 40[5] and past year GAF of 50, (Tr. 175). Plaintiff was placed on medication for depression and panic attacks, and referred for counseling. (Tr. 164, 194).

---

*Diagnostic And Statistical Manual of Mental Disorders*, Fourth Edition, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32. A GAF score from 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See DSM-IV, at 34.

[4]Serious depression and anxiety/tension, hallucinations (hearing voices and seeing shadows in doorways), trouble understanding, concentrating or remembering, trouble with violent behavior from and towards her son, serious sleep and eating problems, difficulties with activities of daily living, including keeping clean, preparing food and keeping appointments (Tr. 172) and a two year history of panic disorder with agoraphobia (Tr. 174-175).

[5]A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairments in several areas such as work or school, family relations, judgment, thinking or mood. A GAF score of 41 to 50 indicates serious symptoms or serious impairment in social, occupational or school functioning. DSM-IV at 32.

On September 20, 1999, Plaintiff was evaluated by Conrad Curtis, PhD, a clinical psychologist, at the request of the Disability Determination Unit. (Tr. 149-151, 155-159). Dr. Curtis described Plaintiff as unkempt, totally dejected in appearance and attitude, "a picture of abject depression." (Tr. 150). He administered the Wide Range Reading Test, the Wechsler Adult Intelligence Scale-III and the Minnesota Multiphasic Personality Inventory-2. (MMPI), and stated "she went through the testing doing her best--the results are considered an accurate representation of functioning ability overal.," (sic). Id. His interpretation of the test results and overall conclusions are quoted here in full:

> I checked her reading level with the Wide Range Reading Test, and it is at best at fifth grade level. While this is really marginal for expecting valid results of the MMPI, she felt she understood the questions and the profile looks like she did have some limited comprehension of the questions, enough to make herself look as bad as possible emotionally.
>
> What we get is an F scale so high as to technically invalidate the protocol as faking bad. Yet we must consider that with her limited ability to cope with the way she feels, all she knows how to do is answer true to everything which sounds like she feels and like her life is. And all she can do is try in this perhaps exaggerated way to get some help. So this is a catastrophic, psychotic MMPI profile but she is in a desperate situation and while not technically psychotic, she does have a few marginal paranoid delusional experiences mentioned in interview, such as seeing shadows and closing all curtains and shades when she goes home with her sone at night. And while a professional may not regard her as psychotic and see the MMPI as faking, to her this is the way she is and feels, she is not intentionally misleading; she is very scared and desperate.
>
> WAIS-III:
>
> She is functioning within the mild range of mental retardation[6] consistently with both verbal comprehension subtests and perceptual organization subtests in the deficit range. The only area where she showed just a little ability was on the Digit Span and Digit Symbol tasks which are coded as working memory and processing speed in those WAIS-III areas including

---

[6]A WAIS-III profile page found at Tr. 157 indicates that Plaintiff's verbal IQ is 66, her performance IQ is 69 and her Full Scale IQ is 65.

> more than one subtest. In reality she has a minimal skill with clerical tasks such as sorting. But those advantages are a 7 scaled score compared with her mostly 4 and 5 scaled scores and not technically significantly different. The only setting in which she might be able to apply that kind of skill would be in a sheltered workshop program for the developmentally disabled.
>
> Notice the very low score on the comprehension subtest, which means she does not know enough to be considered social competent, except at home with her family, doing the most menial tasks of daily living. And even then she depends on her mother and daughter a great deal.
>
> There are some indications she formerly had more ability, or she would not show a fifth grade reading level with her IQ's as they are now, and would not do as well as she did on the Digit Span and Digit Symbol subtests, but she has deteriorated probably as a result of so much failure in life and the inevitable depression. She is functional only in the family.

(Tr. 150-151).

Plaintiff continued to see a psychiatrist and counselors at BAMHS through the period under review. The treatment notes document continued depression, panic attacks and anxiety despite consistent use of anti-depressant and anti-anxiety medications. (Tr. 333-336, 329, 364-367, 327, 323, 317). In March 2000, apparently concurrent with the subsequent finding that she was disabled, attempts were made to have her hospitalized. (Tr. 312-315).

Plaintiff testified that she suffered from depression and anxiety, with daily crying spells, mood swings and an inability to concentrate. (Tr. 42-43). She further stated that she didn't get along with people, stayed mostly to herself, had periods where she "spaced out," and had problems with memory. (Tr. 43-44).

### *Procedural Background*

Plaintiff has filed four applications for supplemental security benefits ("SSI" herein). The first two applications, filed in 1992 and 1993 respectively, were denied administratively without a hearing.

Plaintiff sought no further review of those decisions. (Tr. 22, 55-62). The fourth application, filed March 13, 2000, resulted in a finding that plaintiff met the criteria for disability as of March 1, 2000. (Tr. 229).

Plaintiff's third application for SSI was filed in August 1995. Accordingly, the time period for which benefits are at issue is August 1995 through February 29, 2000. The August 1995 application was denied administratively and by an ALJ following a hearing. (Tr. 67, 74, 130-139). The Appeals Council remanded to the ALJ on November 9, 1998. (Tr. 144-147). A supplemental hearing was held before a different ALJ on December 1, 1999. The claim was denied by the ALJ on January 14, 2000. (Tr. 208-221). The Appeals Council again remanded to the ALJ in a Notice and Order dated March 20, 2003.[7] (Tr. 227-230). A third hearing was conducted on November 13, 2003.[8] (Tr. 30-54). In a decision dated February 23, 2004, the ALJ determined that Plaintiff was not disabled at any time from her date of alleged onset of injury, November 11, 1988, to March 1, 2000, the date she was found disabled. (Tr. 19-29). The Appeals Council declined to review this decision, making the ALJ's February 23, 2004, decision the final decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir.2003); §20 C.F.R. 416.1484(b)(2).

### *Standard of Review*

I review the Commissioner's decision "to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal*

---

[7] The Remand Order cited to the award of benefits made pursuant to plaintiff's fourth application for SSI benefits, stated that this award " suggests that there may be new and material evidence" relevant to the period at issue which the Appeals Council could not locate, and ordered the ALJ to request a formal search for or reconstruction of the claim files assembled in connection with plaintiff's fourth application. (Tr. 229).

[8] The transcripts of the two previous hearings are not contained in the administrative record.

*v. Barnhart,* 331 F.3d at 760. (citation omitted). "Substantial evidence is such relevant evidence as a reasonable minds might accept as adequate to support a conclusion." *Id.* (quotations and citation omitted). However, "[a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there if a mere scintilla of evidence supporting it. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). The agency's failure to apply correct legal standards, or demonstrate that it has done so, is also grounds for reversal. *Winfrey v. Chater*, 92 F3d 1017, 1019 (10th Cir. 1996). Because judicial review is based on the record as a whole, I will meticulously examine the record in order to determine if the evidence supporting the Commissioner's decision is substantial, taking "into account whatever in the record fairly detracts from its weight." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). However, I may not reweigh the evidence or substitute my discretion for that of the Commissioner. *Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995).

### *The ALJ's Findings*

The ALJ followed the required five-step sequential evaluation process for disability claims. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir.1988). A claimant bears the burden of establishing a *prima facie* case of disability at steps one through four. *See id.* at 751 & n. 2. At step one, the ALJ determined that Plaintiff was not gainfully employed. At step two, the ALJ determined Plaintiff's mild mental retardation, major depression and chronic back pain were "severe." At step three, the ALJ found no impairment or combination of impairments that met or equaled a listed impairment. The ALJ's findings to this point are not challenged. At step four, the ALJ determined that Plaintiff had the residual functional capacity for a limited range of light work, but had no past relevant work. Moving to the final step in the evaluation, and based on hypothetical questions posed to a vocational expert (VE), the ALJ determined that there were sedentary, unskilled jobs existing

in significant numbers in the state and national economies[9] that Plaintiff could have performed prior to March 1, 2000. Accordingly, the ALJ held Plaintiff was not disabled at any time prior to that date.

### *Analysis of Plaintiff's Specific Arguments.*

A. *Whether this Court has jurisdiction to consider whether the ALJ failed to comply with the Appeals Council's Remand Order of March 13, 2003.*

The jurisdiction of this court is limited to review of the final decision of the Commissioner of Social Security. 42 U.S.C.A. §405(g). The Order of Remand issued by the Appeals Council on March 13, 2003, was not the Commissioner's final decision. Accordingly, there is no jurisdiction to review the conduct of the ALJ in following this order.[10]

B. *Whether the ALJ's evaluation of Plaintiff's residual mental functional capacity was supported by substantial evidence and the application of correct legal principles.*

The ALJ found that at all times at issue, Plaintiff had the mental residual functional capacity ("RFC") for simple, routine, repetitive work of average pace, that permitted a sit/stand option and did not require a great deal of public interaction. (Tr. 26, 28). This mental/emotional component of this finding was based upon the determination that Plaintiff was not credible, that she was "faking bad" at the time of psychological testing conducted by Dr. Curtis, and therefore the test results "were felt to be invalid due to symptoms magnification." (Tr. 26). The ALJ further stated that the records from BAMHS provided substantial evidence for his assessment of Plaintiff's mental RFC. Plaintiff

---

[9]The jobs were identified by a vocational expert as bench assembler, jewelry preparer, assembly/polisher and jewelry assembler.

[10]It appears that the ALJ obtained all relevant medical records. Plaintiff's representative at the November 13, 2003 administrative hearing represented that the record was complete "for the time period that the Appeals Council's reviewing." (Tr. 33-34). Plaintiff does not point to any medical evidence that is not contained in the Administrative Record.

contends that the ALJ misconstrued the record, failed to support his findings with substantial evidence and failed to apply correct legal principles.

In explaining Plaintiff's MMPI results, Dr. Curtis stated that the F scale technically indicated that Plaintiff was "faking bad" and trying to make herself look as bad as possible. (Tr. 150). He added, however, that Plaintiff was not being intentionally misleading, and that the MMPI results were probably indicative of a cry for help in desperate situation. Id. There is no contrary evaluation or interpretation of MMPI. The ALJ failed to apply correct legal principles when he substituted his medical judgment for that of Dr. Curtis in evaluating the results of the MMPI. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996).

Separate and apart from the MMPI, Dr. Curtis indicated that the WAIS-III documented mild mental retardation, with functional deficits which he felt limited Plaintiff to employment in a sheltered workshop for the developmentally disabled. (Tr. 151). To discredit or ignore this opinion, the Commissioner cites to records of BAMHS describing Plaintiff as "intelligent," However, the ALJ *accepted* Dr. Curtis' conclusion that Plaintiff suffered from mild mental retardation. (Tr. 151, 24, 28). A claimant can not be borderline mentally retarded and intelligent at the same time.

Finally, the ALJ stated:

Although the test results seem to indicate that at the time, the claimant was experiencing severe functional restrictions, her overall daily functioning was not significantly limited. As noted above, the claimant was able to attend school, hold a steady job and care for her children and mother. I therefore find that the results of psychological testing are not consistent with the objective findings of the claimants overall daily functioning and as such are not entitled to significant weight in my determination.

(Tr. 26).

The ALJ clearly misrepresented the record in positing this rationale for disregarding Dr.

9

Curtis's test results and conclusions. Although there is evidence that Plaintiff visited her mother and helped her with housework (Tr. 171), at no time during the period under review did Plaintiff attend school or hold a steady job. Her daughter was an adult during the period under review, who was employed and independent. (Tr. 149). Her son was 18 when the period under review commenced. (Tr. 144, 163). Although Plaintiff stated in October 1995 that she spent her days cleaning, cooking and caring for him (Tr. 97) there is absolutely no evidence what that care entailed.[11]

In referring to the "more recent medical records" from BAMHS, the ALJ stated that they establish that Plaintiff had not consistently taken her prescribed medication and had missed several follow-up appointments. (Tr. 26). Clearly, Plaintiff did discontinue mental health treatment after a brief period in 1997. The document cited by the ALJ is a Treatment Plan prepared by BAMHS, and signed by a treating physician, Gena Hererra, M.D., a therapist, and a supervisor in May 1999. (Tr. 178-183). The treatment plan stated that Plaintiff had a GAF of 31-40, indicating of impairment in reality testing or communication or major impairments in several areas such as work or school, family relations, judgment, thinking or mood. serious functional problems. (See footnote 5, *supra.*). The ALJ ignored this GAF rating. The record indicates that from the time Plaintiff returned to BAMHS in 1999 throughout the remaining time under review she consistently took her medication. (Ex. 35-B, 42-B). She did miss five of twenty-one documented therapy sessions, once due to problems with transportation. *Id.*   In short, the ALJ's decision suggests little more than a selective reading of the BAMHS report, using only those parts most favorable to a finding of nondisability. This approach

---

[11]Plaintiff's son graduated from high school prior to October 13, 1995, and received SSI benefits for mental problems variously described as mental retardation, depression, drug addiction, or schizophrenia. (Tr. 97, 161, 168, 174). Although he still lived at home, he had married and fathered a child as of March 2000. (Tr. 314, 310).

is improper.  *Degan v. Barnhart*, 314 F.Supp.2d 1077, 1086 (D. Kan. 2004) c*iting  See Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir.1984).

I find that the ALJ failed to apply correct legal principles in assessing Plaintiff's mental residual functional capacity for the period at issue, and failed to support his findings with substantial evidence.  These errors invalidate any hypothetical question posed to the vocational expert.

Plaintiff argues that an award of benefits is merited, in view of the repeated errors made by the Commissioner in evaluating her claim.  Plaintiff is currently receiving SSI benefits.  Accordingly, I will not order an award of benefits.  There is evidence in the record that suggests a worsening of Plaintiff's mental status during, but not necessary at the start of the period under consideration.  (See. e.g., Tr.  167, 172).  Resolution of when this worsening resulted in the onset of disability requires evaluation of a fact finder, not this court.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand is granted.  This matter is remanded to the Commissioner of Social Security for additional proceedings consistent with the Memorandum Opinion and Order.  The Commissioner shall reevaluate Plaintiff's mental residual functional capacity during the period under consideration, August 1995 through February 29, 2000, utilizing correct legal principles.  The ALJ shall support his findings as to Plaintiff's mental residual functional capacity with substantial evidence.  In connection with this reevaluation, the Commissioner shall determine the date of onset of disability, utilizing the services of a medical advisor.  See Social Security Ruling 83-20.

**IT IS SO ORDERED.**

Richard L. Puglisi
United States Magistrate Judge
(Sitting by Designation)